IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 12, 2002 Session

## STATE OF TENNESSEE v. DON WOODY MCGOWAN

**Direct Appeal from the Circuit Court for Marion County**
**No. 5116-A    Thomas W. Graham, Judge**

---

**No. M2001-02866-CCA-R3-CD - Filed June 28, 2002**

---

Defendant, Don Woody McGowan, was convicted by a Marion County jury of possession of drug paraphernalia, a Class E felony. Defendant appeals his conviction, presenting the following issues for review: (1) whether the evidence was sufficient to support his conviction; (2) whether he was denied a fair trial by the trial court's denial of his motion to sever the cases when the co-defendant failed to appear on the second day of trial; (3) whether the trial judge erred by failing to recuse himself; and (4) whether his sentence was proper. After a review of the record, we find that the evidence was insufficient to sustain the conviction. The judgment of the trial court is reversed, and the case is dismissed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed.**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOE G. RILEY and JOHN EVERETT WILLIAMS, JJ., joined.

Philip A. Condra, District Public Defender, Jasper, Tennessee, for the appellant, Don Woody McGowan.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; James Michael Taylor, District Attorney General; Steve Blount, Assistant District Attorney General; and Sherry Gouger, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On January 14, 2000, at approximately 6:30 p.m., Officers William Layne and Chad Johnson were on patrol in their squad car when they drove by William T. Green's trailer and noticed approximately four or five individuals standing in the front yard. Both recalled that the area around

Mr. Green's home was well-lit by street lights. Officer Layne testified that he recognized at least four of the individuals as Defendant, Mr. Green, Harvey Layne, and Marty Kilgore. Mr. Kilgore was well-known by local authorities because he had evaded arrest on numerous occasions. Officer Layne further stated that to his knowledge, Mr. Kilgore had numerous outstanding arrest warrants in Marion County. Instead of attempting an arrest, the officers, fearing that a chase might ensue, returned to the police station and arranged for backup assistance.

Approximately one hour later, Officers Layne and Johnson returned to Mr. Green's trailer accompanied by five additional officers from the Marion County Sheriff's Department. The front yard was empty and the trailer appeared dark from the outside. Detective Myers of the Marion County Sheriff's Department and Officer Johnson approached the back door while the other officers secured the front entrance. They then knocked and announced "Sheriff's Department." Although they heard shuffling and rumbling inside the trailer, no one answered the door. After waiting a few minutes, Officer Johnson shined his flashlight through a window on the back door. Detective Myers, who was positioned closer to the door, saw Mr. Green inside the trailer pointing a small handgun towards the back door. He immediately yelled, "he's got a gun," and jerked the door open. As Detective Myers entered the trailer, he saw Mr. Green "pitch" the pistol and begin walking away from the door at a fast pace, heading towards a bedroom that was on the left side of the trailer. At the same time, Defendant appeared from a bedroom that was on the opposite end of the trailer. Officers ordered Defendant to put his hands up and sit down on the couch. Officer Johnson testified that when he entered the trailer, shortly after Detective Myers, Defendant was already sitting on the couch. He recalled that the inside of the trailer had a "chemical smell kind of like fuel." Officer Johnson later retrieved a loaded handgun from inside a clothes dryer that was adjacent to the back door.

As the two men were detained, Officer Layne and other officers entered the premises. Officer Layne testified that when he entered the back door, he detected a chemical odor and smelled smoke. He then heard a loud "pop," which sounded like a gunshot, come from a bedroom located on the left side of the trailer. Unsure if shots had been fired, he and Detective Williams approached the bedroom with caution. The room was dimly lit by a small lamp that was connected to an extension cord. As Officer Layne opened the door, he noticed a pile of paper burning on top of a red duffel bag on the floor and immediately extinguished the fire. Upon closer inspection, he discovered that the burning papers were a mixture of coffee filters and paper towels. Noticing that the duffel bag was partially unzipped, he could identify some of its contents which included a twenty ounce Sun Drop bottle with tubing coming out of the top and a glass jar with brown liquid and coffee filters inside. Officer Layne testified that based on his training and experience, these and the additional items discovered inside the duffel bag were commonly used to manufacture methamphetamine. Officer Johnson testified that the popping sound was later determined to be the cause of one of the "gassers" or the "generator" exploding when it caught fire. He explained that a "generator" is another name for a bottle with tubing attached to it that would be used to "gas off," a procedure commonly used in manufacturing methamphetamine.

2

The trailer was described as being sixty feet long, and contained a living room, bathroom and kitchen. It had two small bedrooms on opposite ends of the trailer. The bedrooms were also separated from the main living space by a small hallway. The trailer did not have any power source, and the only source of electricity was an extension cord that ran from the trailer to Harvey Layne's home, located on an adjacent lot. Office Johnson estimated that the distance from the back door, where officers first entered the trailer, to the bedroom where the red duffel bag was discovered was approximately four to five feet. He further testified that a rough estimate of the distance between the couch, where Defendant was initially detained, and the bedroom with the red duffel bag was approximately thirty feet, the length of half the trailer.

After obtaining a search warrant, Detective Myers and Officer Layne returned to the trailer and conducted a thorough search of the premises. Officer Layne inspected the bag's contents and photographed the evidence. He also inspected and photographed other items in the house including a crock pot with white residue, which was discovered in the kitchen, and a box of matches. Officer Layne compiled a list of the items found in the red duffel bag which included the following: ephedrine pills, coffee filters which contained a residue, two bottles, two twenty ounce coke bottles with tubing coming out of them, a quart fruit jar with coffee filters, a gallon jug of muriatic acid, one bottle of heet, a funnel, a coffee pot with residue on it, a square dish with red powder residue, two jars with a clear liquid in them, and assorted tubing and jars that contained an oil substance.

Crosby Jones, a Special Agent with the Drug Enforcement Agency, testified that on January 14, 2000, he was summoned to Mr. Green's residence in his official capacity as a site safety officer. As a site safety officer, it is his responsibility to enter alleged laboratories where hazardous material is manufactured and take samples, process the samples, and ensure that the hazardous substance is disposed of in the proper manner. His duties also include overseeing officers at the scene to ensure that they are performing their jobs properly, and ensuring that the samples are retrieved properly.

Agent Jones testified that he has received specialized training about the production of methamphetamine. He testified that his training has included learning the process for manufacturing methamphetamine under laboratory controlled conditions and also under "home-made" laboratory conditions, which are commonly seen in fieldwork. He then described the procedure for "cooking" methamphetamine, explaining that many chemicals used to produce methamphetamine can be found at any grocery store.

Agent Jones testified that he personally unpacked the red duffel bag and assessed the contents. He also confirmed that the bag contained the majority of the ingredients used to "cook" methamphetamine, including the following: 150 pseudoephedrine tablets, glass jars, two bottles of 12 ounce Heet line antifreeze, two plastic bottles with attached tubing, coffee filters, red phosphorus on a matchbook cover, lye, Coleman Fuel, one gallon jug of muriatic acid, two glass coffee pots, two quart empty jars, one single eye burner, one blue glass bowl containing white sludge material, one iron skillet with brown color residue, one crock pot containing an off white powder residue, and one Pyrex cooking dish containing off white powder residue. He admitted that officers did not discover iodine, an ingredient commonly used in the manufacturing process, in the trailer. However, he

3

explained that this was not uncommon because during the manufacturing process, iodine cooks out completely. Thus, the absence of the raw substance would not be uncommon. However, he testified that he found traces of iodine on coffee filters that were in the bag and strewn around the room.

On cross-examination, Agent Jones further admitted that he did not find acetone, another ingredient required to produce methamphetamine. However, he testified that he did discover a clear liquid in a jar which he believed was acetone. Although it was not tested, he was able to recognize the smell of acetone, which is commonly used as a fingernail polish remover. Furthermore, although the trailer failed to contain a heat source, which is needed to "cook" the final solution, he stated that this step can be bypassed by combining iodine, red phosphorus, and a water solution to create natural heat.

Detective Myers, assisted by Agent Jones, retrieved a liquid sample from two containers that were removed from the red duffel bag. The first sample was retrieved from a glass jar which contained a brown liquid and coffee filters, and the second sample was retrieved from a plastic bottle with a hose protruding out of it. Each sample was placed in a glass container and sealed with a lid. Then, each sample was placed in a plastic bottle and capped. Finally, each sample was packaged in a bag and submitted to Officer Layne for storage until the samples could be submitted to the crime lab for testing. The coffee filters were also submitted to the crime lab for testing. Officer Layne testified that he observed as each sample was inspected, retrieved, labeled, stored, and then recorded on a log sheet.

Detective Williams, acting as custodian, transported the evidence to and from the Tennessee Bureau of Investigation's Crime Laboratory located in Chattanooga, Tennessee. He testified that based on his knowledge, the samples that he received from the scene did not come from Defendant. He further stated that on January 14, 2000, the temperature inside the trailer was colder than the temperature outside.

Brett Trotter, a forensic chemist for the Chattanooga Regional Crime Laboratory, testified that on February 22, 2000, he performed a drug analysis on two liquid samples, brown in color. His initials were placed on the bag which contained the evidence. He testified that both samples tested were positive for traces of methamphetamine, a Schedule II controlled substance. Alex Brodhag, also a forensic chemist at the TBI Crime Laboratory in Chattanooga, analyzed the coffee filters submitted as evidence in this case. He testified that the coffee filters contained a small amount of powdery residue. When tested, the residue on the coffee filters revealed the presence of methamphetamine. Adam Gray, another forensic chemist who tested a sample from the second coffee filter submitted, testified that the residue found on the filter also tested positive for methamphetamine.

The State rested its case.

Defendant was the sole witness for the defense. He testified that on January 14, 2000, he traveled to Whitewell to visit with friends. He stated that on that evening, he visited his brother-in-

4

law, Harvey Layne. While there, he, Mr. Layne and Mr. Green, and Mr. Green's girlfriend, Angie, were standing outside Mr. Layne's home talking. Although Defendant admitted that he was acquainted with Mr. Kilgore, he denied being with Mr. Kilgore on January 14, 2000. He further denied seeing a patrol car drive by Mr. Layne's residence.

After talking for awhile, he and Mr. Green went to the store to purchase a beer. Upon their return, they discovered that Mr. Layne had gone inside his home. Mr. Green then invited Defendant into his trailer, located next door, to wait for Mr. Layne to return. He stated that he entered the trailer and sat down on the couch. Angie also accompanied them into the trailer, and she and Mr. Green disappeared into a back bedroom. Within minutes, Angie reappeared and left. Defendant stated that only moments later, the back door flew open and someone yelled at him to "hit the floor." Defendant testified that he immediately got down on the floor until he was later ordered to sit on the couch. As he "hit the floor," he heard a "pop" inside the trailer which sounded like a gunshot. He then yelled, "I'm over here on the floor, don't shoot me." He testified that he was unable to see who entered the trailer or whether they had guns. He denied hearing anyone knock on the door. He further testified that the couch in the living room faces the front door and that he did not see Mr. Green approach the back door with a gun. Defendant stated that he was in the trailer less than fifteen minutes before police entered, and that he did not go through the trailer and was unaware of its contents. He also testified that he never saw the red duffel bag in the back bedroom and did not remember smelling anything inside the trailer, or seeing any smoke.

In February 2000, Defendant was indicted, along with his co-defendant, William T. Green, for criminal attempt to manufacture a Schedule II controlled substance; unlawful possession of a weapon with intent to employ it in the commission of the offense of attempt to manufacture a Schedule II controlled substance; felony possession of drug paraphernalia; and possession of a legend drug without a prescription. Later, the trial court dismissed both Count II (unlawful possession of a weapon), and Count IV (unlawful possession of a legend drug), against Defendant, and Count IV against the co-defendant.

Defendant was acquitted of attempt to manufacture a Schedule II controlled substance, but was convicted of possession of drug paraphernalia with intent to deliver and fined $3,000.00. On November 6, 2000, Defendant was sentenced as a Range II, multiple offender, and received the maximum four year sentence. Defendant's fine was later reduced from $3,000.00 to $500.00. Defendant filed a timely notice of appeal to this Court.

**ANALYSIS**

I.      Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to sustain his conviction for possession of drug paraphernalia. We agree.

5

When evaluating the sufficiency of the evidence, we must review the evidence, in the light most favorable to the prosecution, to determine if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Keough, 18 S.W.3d 175, 180-81 (Tenn. 2000) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed.2d 560 (1979)). A guilty verdict shall be set aside on appeal if the evidence was insufficient to support the findings of guilty beyond a reasonable doubt. Tenn. R. App. P. 13(e). The burden rests with Defendant to prove that the evidence was insufficient to support the verdict returned by the trier of fact. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

On appeal, the prosecution is entitled to the strongest legitimate view of the evidence in the record, as well as all reasonable and legitimate inferences that may be drawn from the evidence. See Keough, 18 S.W.3d at 181 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. The trier of fact resolves all questions concerning witnesses' credibility, the weight and value to be given the evidence, and all factual issues; the evidence will not be reweighed or reevaluated. See id.; State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). The standard for appellate review is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Vann, 976 S.W.2d 93, 111 (Tenn. 1998).

Defendant contends that although the evidence was sufficient to support a finding that the items seized were drug paraphernalia, the State failed to prove his "possession, either actual or constructive." He further argues that his mere presence at the residence is insufficient, by itself, to support the conviction.

A conviction of possession of drugs or drug paraphernalia may be based upon either actual or constructive possession. See State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987) (citing State v. Williams, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981)). In discussing the nature of constructive possession in a similar context, this Court has stated that before a person can be found to constructively possess drugs or drug paraphernalia, it must appear that the person has "the power and intention at a given time to exercise dominion and control over . . . [the drugs or drug paraphernalia] either directly or through others." State v. Transou, 928 S.W.2d 949, 955-56 (Tenn. Crim. App. 1996) (citing Cooper, 736 S.W.2d at 129). However, mere presence in an area where the drugs are discovered is not, standing alone, sufficient to support a conviction for possession. See id. at 956. "Likewise, mere association with a person who does in fact control the drugs or property where the drugs are discovered is insufficient to support a finding that the person possessed the drugs." See id.

Viewed in the light most favorable to the State, this Court finds that the evidence at trial was insufficient to convict Defendant of felonious possession of drug paraphernalia beyond a reasonable doubt. First, the officers acknowledged that Defendant did not reside in the residence in which the drug paraphernalia was found. Second, the officers did not find the drug paraphernalia on Defendant's person. Third, Detective Myers, the first officer into the trailer, testified that Defendant

6

was seen and detained upon exiting a bedroom on the opposite side of the trailer from where the drug paraphernalia was later discovered. Furthermore, officers failed to discover any evidence connecting Defendant with the trailer or its contents. In addition, Detective Williams, another officer on the scene, testified that there was no evidence to connect Defendant with the drug paraphernalia, "just that he was there." Defendant's mere presence in co-defendant's trailer is not, standing alone, sufficient to support a conviction of possession of drug paraphernalia. See Cooper, 736 S.W.2d at 129. Nor was his mere association with co-defendant, the person who controlled the property where the drug paraphernalia was discovered, sufficient to support his conviction. See Whited v. State, 483 S.W.2d 594 (Tenn. Crim. App. 1972); Dishman v. State, 460 S.W.2d 855, 858 (Tenn. 1970).

The State concedes that although Defendant's mere presence in the trailer was insufficient to support a conviction, the "logical force" of the evidence was sufficient to support a finding that Defendant "intended to exercise dominion and control over the duffel bag of meth lab paraphernalia." This is mere speculation. Although it is well established that circumstantial evidence alone may be sufficient to support a conviction, see State v. Richmond, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999), before an accused may be convicted of a criminal offense based exclusively upon circumstantial evidence, "it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that [the defendant] is the one who committed the crime." State v. Crawford, 470 S.W.2d 610, 612 (1971) (quoting Pruitt v. State, 460 S.W.2d 385, 390 (1970)). In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Crawford, 470 S.W.2d at 613. We find that this evidence does not exclude every other reasonable hypothesis save the guilt of [Defendant]. See id. In sum, we find that the evidence was insufficient to sustain Defendant's conviction. In the event of further review, we will address Defendant's remaining three issues on appeal.

II.     Motion to Sever

Defendant contends that the trial court erred by denying his motion to sever his trial. Defendant claims that due to the overwhelming amount of evidence against co-defendant Green, the trial court should have severed his case to "promote a fair determination of his guilt or innocence." We disagree.

Defendant presented two motions to sever his trial from co-defendant, both of which were denied by the trial court. The first motion was presented before the trial began, and the second motion was presented orally, during the trial, when co-defendant failed to reappear on the second day of trial. Severance of defendants is allowed pursuant to Rules 13(b) and 14(c) of the Tennessee Rules of Criminal Procedure. Rule 14(c)(2)(i) and (ii) of the Tennessee Rules of Criminal Procedure provides that the court shall grant a severance of defendants, before or during trial, if deemed appropriate to promote or achieve a fair determination of the guilt or innocence of a defendant.

The grant or denial of a motion for severance of defendants is a matter that rests within the sound discretion of the trial court. See State v. Burton, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988). This Court will not disturb the trial court's decision to deny or grant a severance of co-defendants absent clear abuse of that discretion. See State v. Woods, 806 S.W.2d 205, 211 (Tenn. Crim. App. 1990). "The exercise of that discretion will not be reversed absent an affirmative showing of prejudice." State v. Ensley, 956 S.W.2d 502, 508 (Tenn. Crim. App. 1996). In other words, the record must reveal that "the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty." Parham v. State, 885 S.W.2d 375, 383 (Tenn. Crim. App. 1994).

We find no abuse of discretion. At the conclusion of the evidence, the trial court issued the following jury instruction:

> Now, ladies and gentlemen, you should give separate consideration to each defendant. Each is entitled to have his case decided on the evidence and the law which is applicable to that particular defendant. Any evidence which was limited to a particular defendant should not be considered by as to any other defendant.

The jury is presumed to have followed the instructions of the trial court. See State v. Cribbs, 967 S.W.2d 773, 784 (Tenn. 1998). In order to overcome this presumption, the defendant must show by clear and convincing evidence that the instruction was not followed. See State v. Newsome, 744 S.W.2d 911, 915 (Tenn. Crim. App. 1987). Defendant has failed to present evidence to overcome this presumption. On the contrary, the record reveals that although both defendants were charged with attempt to manufacture a Schedule II controlled substance, the co-defendant was convicted and Defendant was acquitted. Defendant is not entitled to relief on this issue.

III.    Failure to Recuse

Defendant next contends that the trial judge erred by denying his motion for recusal. He claims that the trial judge should have recused himself because his "impartiality could reasonably be questioned."

After the trial, but prior to sentencing, Defendant filed a motion for recusal based on the trial judge's prior representation and personal opinion of Defendant. The motion was based on a comment made during a lunch with the trial judge, district attorney, and defense counsel present in another county during a break in an unrelated matter. During the lunch, the trial court made the comment that he had represented the Defendant some 20 to 25 years previously in a case where Defendant was acquitted. The trial court observed that the then district attorney made the comment that Defendant would be back in court "every day from that day on." At the hearing on the motion to recuse, the trial court remarked "[a]nd [the district attorney] was somewhat right." Immediately after making this statement, Defendant's counsel was stating that the court arguably had a negative view of Defendant and that was the reason for filing the motion to recuse. The trial court interposed at the motion for recusal, and the following was stated on the record:

THE COURT:            (Interposing) Heck, I remember - - I remember him as far anything that would be prejudicial I remember him - - his involvement with the killing of what was his name, Bubba?

GENERAL GOUGER:      Bubba Winchester.

THE COURT:            Bubba Winchester, and everybody in the county knew that. I mean, you know, he was actually indicted and was on the lam for years.

[DEFENSE COUNSEL]:    No, sir, he was not on the lam.

THE COURT:            He wasn't?

[DEFENSE COUNSEL]:    No, sir, he was not on the lam, and that's absolutely not correct. In point of fact, - -

THE COURT:            (Interposing) He was out of county, but under indictment for a long, long time.

[DEFENSE COUNSEL]:    Judge, I think and you know since the Court's brought up that - - that particular matter. That matter was set for trial, if my memory serves me correctly and I haven't gone - - we were appointed to represent Mr. McGowan in that case and I want to say it was in '89, '90. That case was set for trial and Mr. McGowan, there was an offer made in that case, shortly before trial, it was rejected. I want to say this was around the time that [the district attorney's wife] died, but I may be confusing my time frames, that [she] died, sometime maybe that week-end or whatever, but Mr. McGowan was not on the lam. He was prepared to go to trial on that case that was set for trial.

THE COURT:            Maybe - - maybe he was out of the county by exile or something, I remember some comments about it.

                            * * *

THE COURT:            Well, obviously nothing ever occurred from it. I mean, the State whatever the situation the State decided to drop further prosecution because there was

9

|  |  |
|---|---|
|  | never any ultimate resolution other than a dismissal or something, what happened to it? |
| [DEFENSE COUNSEL]: | Well . . . . |
| THE COURT: | Was he retired after that case or what? |
| [DEFENSE COUNSEL]: | Judge, I honestly can't tell you what - - - |
| THE COURT: | (Interposing) Don't remember. |

\* \* \*

| | |
|---|---|
| [DEFENSE COUNSEL]: | Well, that's what I'm observing, Your Honor, is that [co-defendant] did not come back til the second day of trial, and at that time we made a – we asked the Court to sustain our motion to sever or made another motion to sever in the case as to Mr. McGowan. So I just basically think that the Court may have some misinformation about Mr. McGowan as evidence here today with the matter of Mr. Winchester's case were Mr. McGowan was not on the lam - - - - |
| THE COURT: | (Interposing) Well, it's not misinformation it may be saying on the lam is a little broad, but he certainly was connected with it, indicted for it, and you know, it was up in the air for a long time is all I knew. |
| [DEFENSE COUNSEL]: | So that's the basis of - - for this motion to recuse that the Court may have a negative view of Mr. McGowan as a result of a lot of maybe information, some correct, some not correct, and I felt it appropriate as his attorney to bring that to the Court's attention and respectfully request the Court recuse itself from further considerations in the sentencing and the motion for new trial, and the things that will obviously follow. |

Following the above argument and discussion on the record, the trial court ruled denying the motion to recuse, stating as follows:

| | |
|---|---|
| THE COURT: | The Court knows what it has in its own heart, sounds like a political candidate, doesn't it? And in his case |

there's - - the Court has no bias as far as mistreating him. It's hard to be a judge in a rural district and not know about people's past criminal contact with the system. I mean, gosh, if we had to recuse every time we knew of somebody's past deeds that may or may not be viewed in a good light, I mean we wouldn't be able to try about half of the people we have in here, they're all repeat offenders. So anyway I deny your motion.

During the motion for new trial hearing, the following occurred while defense counsel was arguing that the evidence was insufficient to sustain the conviction:

THE COURT:                     (Interposing) No, reasonable - - -

[DEFENSE COUNSEL]:             Except guilt. Except guilt. Not that you can think of a reason to convict him, but that the evidence must exclude every other reasonable explanation. That evidence was not here. This was as weak a case as I've seen the State of Tennessee bring as far as Don Woody McGowan's concerned.

THE COURT:                     One of his many cases.

[DEFENSE COUNSEL]:             Well, which brings us to some more thoughts that there was some statement made here in the courtroom that are not correct. Dealing with a totally unrelated case years ago and was not ever resulting in any kind of conviction yet - - - -

THE COURT:                     (Interposing) Well, the jury didn't have any of that before them - - -

Finally, we note that at the beginning of the hearing on the motion to recuse, the following transpired:

[DEFENSE COUNSEL]:             What I was wanting to bring to the Court's attention is in a case that the Court tried recently involving - - it's case number 5116, Don Woody McGowan, and Judge - - -

THE COURT:                     His name came up again today I noticed.

11

GENERAL GOUGER:          And guess where.

[DEFENSE COUNSEL]:       Yes.

THE COURT:               At a crack - - at a meth lab.

[DEFENSE COUNSEL]:       I've been practicing law 28 years and this to my
                         knowledge is the first time I've asked a Court to
                         recuse itself.  So I'm treading in areas that I'm not
                         accustomed to doing.

THE COURT:               Okay.

First, we note that normally, the proper time for Defendant to raise the issue of recusal would have been pre-trial, not prior to sentencing.  A motion to recuse that is filed after the trial begins is waived. See Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997).  However, because Defendant claims that the trial judge's apparent partiality was discovered several weeks after the trial, we will address Defendant's claims on the merits.

The decision of whether to grant a recusal rests within the discretion of the trial judge and will not be overturned on appeal unless clear abuse of that discretion appears on the face of the record.  See State v. Hines, 919 S.W.2d 573, 578 (Tenn. 1995).  A motion to recuse should be granted if the judge has any doubt as to his or her ability to preside impartially in the case, or whenever he or she believes that his or her impartiality can reasonably be questioned.  Tenn. Sup. Ct. R. 10, Canon 3(E); see Lackey v. State, 578 S.W.2d 101, 104 (Tenn. Crim. App. 1978).  Moreover, recusal is warranted "when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." Alley v. State, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994).  In other words, the determining standard is an objective one, not a subjective one. See id. at 820.  Courts must avoid the appearance of partiality as well as partiality itself. See id. at 823.  Furthermore, any comments made by the trial court must be construed in the context of all the facts and circumstances to determine whether a reasonable person would construe those remarks as indicating partiality on the merits of the case. See id. at 822.  However, we note that a judge is in no way disqualified merely because he has participated in other legal proceedings against the same person.  See Hines, 919 S.W.2d at 578 (citing King v. State, 391 S.W.2d 637, 642 (1965)).

Initially, we note that it would not be unusual for a trial judge, particularly in a rural area, to be aware that a defendant had previous charges, as well as the disposition of those charges.  Such knowledge certainly does not mandate recusal.  However, if a trial judge, on the record, expresses an unfavorable opinion about a defendant's alleged prior criminal conduct in an unrelated matter which has not been adjudicated or is inconsistent with the disposition of the matter, then there is an objective appearance of partiality even though the judge can be subjectively fair and impartial. Recusal is required in such a situation.

The crux of the issue before this court is whether the trial judge's remarks could reasonably be interpreted as simply relating to the defendant's prior <u>procedural</u> history, or whether the judge was expressing an unfavorable opinion of the defendant based upon the judge's perception of <u>unadjudicated prior conduct</u> in unrelated matters. We view this issue from an objective perspective.

The defendant was facing sentencing for a felony. The trial judge stated at the motion hearing: he "remember[ed the defendant's] involvement with the killing of Bubba [Winchester];" "everybody in the county knew that;" the defendant was "on the lam for years;" and although it may be "saying on the lam is a little broad, ... he certainly was connected with it...." We believe these remarks were unfortunate and certainly called into question from an objective perspective an appearance of partiality as it relates to sentencing. Nevertheless, we do note that the trial judge spoke in his ruling about the difficulty of a rural trial judge not being aware of a defendant's "past criminal contact with the system." Certainly, this is true.

The issue of recusal is a close one as it relates to sentencing, although the issue is moot in light of our dismissal for insufficiency of the evidence. Had we not dismissed, we would remand for resentencing by a different judge, and would not address the sentencing issues raised by Defendant.

IV.    Sentencing

Finally, Defendant challenges the trial court's denial of alternative sentencing. Specifically, he argues that because he was convicted of a Class E felony, the trial court erred by ordering his sentence to be served in the Tennessee Department of Correction. He also contests the method of service and length of the sentence.

When the defendant challenges the length, range, or manner of service of a sentence, this Court conducts a de novo review of the record with a presumption that the determinations made by the sentencing court were correct. <u>See</u> Tenn. Code Ann. §§ 40-35-401(d), -402(d) (1997). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting a de novo review, this court must consider (a) all the evidence at trial and the sentencing hearing, (b) the presentence report, (c) the sentencing principles, (d) the arguments of counsel, (e) the nature and characteristics of the offenses, (f) any statutory mitigating and enhancement factors; (g) any statement that the Defendant made on his own behalf, and (h) the defendant's potential for rehabilitation. <u>See</u> Tenn. Code Ann. §§ 40-35-102, -103, -210(b) (1997). The burden of showing that a sentence was improper is upon the appealing party. <u>See</u> Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments.

The presumptive sentence to be imposed by the trial court for a Class B, C, D or E felony is the minimum within the applicable range unless there are enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c) (1997). Where one or more enhancement factors apply but no mitigating factors exist, the trial court may sentence above the presumptive sentence, but still within

13

the range. See id. at § 40-35-210(d) (1997). Should both enhancement and mitigating factors exist, the trial court must begin sentencing at the presumptive sentence (i.e., the midpoint of the range for Class A felonies and the minimum sentence in the range for Class B, C, D, and E felonies), enhance the sentence within the range as appropriate for the enhancement factors and then reduce the sentence within the range as appropriate for the mitigating factors. See id. at § 40-35-210(e) (1997). Because the record in this case indicates that the trial court properly considered the sentencing principles and all relevant facts and circumstances, our review is de novo with a presumption of correctness.

Defendant was convicted of possession of drug paraphernalia, a Class E felony. He was sentenced as a Range II offender. The possible range of punishment for a Range II, multiple offender is two to four years for a Class E felony. Tenn. Code Ann. § 40-35-112(b) (5) (Supp. 2001). The trial court imposed the maximum sentence of four years in the custody of the Department of Correction. Defendant does not contest his Range II offender status. In fact, he states, "[t]hat finding is more than amply supported by the record." However, Defendant claims that because his conviction is for a Class E felony, he should be afforded an alternative sentence. He further argues that the trial court failed to enunciate on the record which considerations in Tennessee Code Annotated section 40-35-103 warranted confinement.

Tennessee Code Annotated § 40-35-102 (5) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration[.]

A defendant who does not fall within this class of offenders "and who is an especially mitigated offender or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6) (1997). Furthermore, "[t]he trial court must presume that a defendant sentenced to eight years or less and not an offender for whom incarceration is a priority is subject to alternative sentencing and that a sentence other than incarceration would result in successful rehabilitation . . . ." State v. Byrd, 861 S.W.2d 377, 379-80 (Tenn. Crim. App. 1993); see also Tenn. Code Ann. § 40-35-303(a) (Supp. 2001). However, if the court is presented with "evidence sufficient to overcome these presumptions, then it may sentence the defendant to confinement according to the statutory provision." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). Evidence sufficient to overcome the presumption includes evidence showing that:

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

14

(C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1)(A)-(C) (1997).

The presumption in favor of alternative sentencing may be overcome by facts contained in the pre-sentence report, evidence presented by the State, the testimony of the accused or a defense witness, or any other source, provided it is made a part of the record. See State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). Additionally, a court should consider the defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. See Tenn. Code Ann. § 40-35-103(5) (1997). A court may also apply the mitigating and enhancement factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114, as they are relevant to sentencing considerations in Tennessee Code Annotated section 40-35-103. See id. at 40-35-210(b) (5) (Supp. 2001).

We find that Defendant's sentence was proper. Defendant, as a Range II multiple offender, is not entitled to a presumption that he is a favorable candidate for alternative sentencing under Tennessee Code Annotated section 40-35-102(6). Moreover, Defendant is not entitled to alternative sentencing, based on the sentencing consideration listed in Tennessee Code Annotated section 40-35-103(1)(A), (C). At the sentencing hearing, the State introduced into evidence, without objection, the pre-sentence report. Defendant did not put on any proof. The pre-sentence report indicated that Defendant has a lengthy history of criminal conduct including six prior felony convictions including second degree burglary, third degree burglary, petit larceny, felony sale of marijuana and aggravated assault, and two prior misdemeanor convictions. The report also indicates that in at least two instances, Defendant committed prior offenses while on probation or parole for another offense. The trial court, relying on the pre-sentence report, held that Defendant has an extensive history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range and that his failure to comply with the conditions of a sentence involving release into the community precluded any lesser sentence or alternative sentencing. See Tenn. Code Ann. § 40-35-114(1), (8) (Supp. 2001). Because Defendant has a "long history of criminal conduct" and because "measures less restrictive than confinement" have failed, we conclude that Defendant is not entitled to an alternative sentence. See id. at §40-35-103(1)(A), (C). Defendant is not entitled to relief on this issue.

## CONCLUSION

Accordingly, because the evidence was insufficient to sustain the conviction, the judgment of the trial court is reversed and the case is dismissed. Furthermore, if the evidence had been sufficient to sustain the conviction, this matter would have been remanded for a new sentencing hearing.

_____
THOMAS T. WOODALL, JUDGE